**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| KRISTAL L. YANDO, Plaintiff, vs. COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, Defendant. | CASE NO. 5:25-cv-02010<br>JUDGE BENITA Y. PEARSON<br>MAGISTRATE JUDGE AMANDA M. KNAPP<br>**REPORT AND RECOMMENDATION** |

Plaintiff Kristal L. Yando ("Plaintiff" or "Ms. Yando") seeks judicial review of the final decision of Defendant Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's final decision.

## I. Procedural History

Plaintiff filed her DIB application on September 15, 2022, alleging an onset date of January 11, 2021. (Tr. 18, 97, 273-79.) She alleged disability due to: carpal tunnel; pain in the neck, shoulders, and arms; left arm tendinitis; torn left bicep; bone on bone in neck; pinched nerve in neck; limited left side mobility; high blood pressure; acid reflux; and insomnia. (Tr. 82, 89, 349.) Ms. Yando's application was denied initially and upon reconsideration (Tr. 18, 103-12, 115-22), and she requested a hearing (Tr. 125-28). After conducting a hearing on Ms. Yando's

claim (Tr. 43-69), an Administrative Law Judge ("ALJ") issued a decision denying her application on September 19, 2024 (Tr. 15-42). On July 24, 2025, the Appeals Council denied Ms. Yando's request to review the ALJ decision, making the September 19, 2024 decision the final decision of the Commissioner. (Tr. 1-6.)

Ms. Yando filed her Complaint on September 22, 2025, challenging the Commissioner's final decision denying her application for disability benefits. (ECF Doc. 1.) The matter is fully briefed. (ECF Docs. 7, 8, & 9.) Ms. Yando raises the following issue in this appeal:

> The ALJ violated 20 C.F.R. § 404.1520c by failing to properly evaluate the opinion evidence provided by the treating source.

(ECF Doc. 7, pp. 2, 7-11; ECF Doc. 9.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Yando was born in 1970 and was 52 years old on the date last insured, making her an individual closely approaching advanced age under Social Security Regulations. (Tr. 34, 273.) She completed school through the eleventh grade. (Tr. 34, 50, 350.) She has past work as a cashier (Tr. 50-52, 63) and stopped working in early 2021 (Tr. 50-51, 349).

### B. Medical Evidence

#### 1. Relevant Treatment History

Ms. Yando's treatment relationship with Patrick Howe, FNP-C, APRN, started prior to the alleged onset date, when she met with him to establish as a new patient on June 10, 2020. (Tr. 720-21.) She reported left shoulder pain that started two weeks earlier. (*Id.*) She said she was reaching into her washer and felt her shoulder "pop." (*Id.*) She went to the urgent care the night it happened and was diagnosed with cervicalgia and left shoulder tendonitis, and was prescribed medication. (*Id.*; Tr. 856-58.) She said her pain persisted and she was unable to

perform work-related functions due to her pain. (Tr. 721.) She also reported intermittent numbness and tingling down her arm and limited range of motion. (*Id.*) On examination, APRN Howe observed that Ms. Yando was in obvious pain in her left upper extremity/shoulder and extremely tender to palpation over the shoulder region, scapula, and clavicle. (*Id.*) Her range of motion was limited to less than 90 degrees in the left shoulder. (*Id.*) A shoulder x-ray was ordered, and Ms. Yando was referred to physical therapy. (Tr. 720.) She was advised to use ice and heat for pain relief. (*Id.*)

Ms. Yando presented for a physical therapy evaluation on June 17, 2020. (Tr. 657-61.) Therapy was recommended to occur twice a week for eight weeks. (Tr. 660.)

During a telehealth visit with APRN Howe on August 3, 2020, Ms. Yando reported that she had completed physical therapy, with significant improvement in her symptoms and only intermittent discomfort. (Tr. 729.) She hoped to return to work and had no concerns with respect to completing her job duties. (*Id.*)

On January 13, 2021, shortly after the alleged onset date, Ms. Yando reported to APRN Howe that she injured her left shoulder while lifting a tote off a pallet at work. (Tr. 732.) She said the pain was similar to her prior shoulder pain. (*Id.*) She also reported left-sided neck pain, headaches, and nausea. (*Id.*) She denied numbness or tingling. (*Id.*) Ms. Yando had obvious pain in the left upper extremity/shoulder on examination and showed extreme tenderness to palpation over the entire shoulder, scapula, and clavicle. (Tr. 733.) Range of motion was limited to 90 degrees in the left shoulder. (*Id.*) Left shoulder x-rays from January 19, 2021, showed no acute fracture or dislocation, mild to moderate changes in the acromioclavicular joint, and a preserved coracoclavicular distance. (Tr. 830.)

Ms. Yando returned to APRN Howe for follow-up on January 27, 2021. (Tr. 735.) Ms. Yando reported that her left shoulder pain was more manageable; she was using naproxen as needed and a muscle relaxer. (Tr. 736.) But she also said that she did not feel that her symptoms had improved, and she did not feel ready to return to work. (*Id.*) Her range of motion remained very limited. (*Id.*) She was only able to lift her left arm to 90 degrees without tenderness. (*Id.*) Authorization for an MRI was pending. (Tr. 735.) APRN Howe referred Ms. Yando to Mark Holt, an orthopedic specialist, and advised her to continue with her strengthening exercises. (*Id.*)

On February 16, 2021, Ms. Yando met with APRN Howe for a telehealth visit. (Tr. 739.) She reported that her left shoulder pain had improved but she was still having a hard time completing activities of daily living. (Tr. 739.) She said she tweaked her shoulder when trying to clean up following a flooding issue at her house. (*Id.*) She was using naproxen and a muscle relaxer which helped control her pain. (*Id.*)

On February 22, 2021, Ms. Yando presented to Mark Holt, M.D., at Hocking Valley Orthopedics for evaluation of her left shoulder. (Tr. 676.) She said her left shoulder first bothered her in June of 2020. (*Id.*) She treated with physical therapy and returned to work. (*Id.*) She started to have symptoms again after returning to work, more recently in January 2021. (*Id.*) Her pain was in her neck, trapezius, and shoulder, and down into the mid arm area. (*Id.*) She said the pain was constant and worsened with motion of the neck or shoulder or activity. (*Id.*) She also said her pain was causing migraines. (*Id.*) She had tried treating her pain with icy hot, naproxen, and Flexeril. (*Id.*) She rated her pain that day at 8 out of 10, with burning and tingling sensations. (Tr. 677.) Based on his examination, Dr. Holt found that Ms. Yando's tenderness in the left shoulder was out of proportion to expectations, noting that "[e]ven before touching her she was pulling away as well as pushing [his] hand away." (Tr. 678-79.) There was no swelling,

bruising, atrophy, or deformity in the left shoulder and sensation to light touch was intact. (Tr. 678.) There was good range of motion in the fingers, wrist, and elbow, but pain throughout the entire left shoulder with flexion at 70 degrees and abduction at 60 degrees and diffuse pain with Neer and Hawkins impingement. (Tr. 679.) There was no pain with external rotation at 60 degrees. (*Id.*) Dr. Holt diagnosed left rotator cuff tendinitis. (*Id.*) He recommended that she continue to use naproxen. (*Id.*) He also advised her to moderate activities according to symptoms, avoid aggravating activities, initiate physical therapy, and perform her home exercise program. (*Id.*) He took her off work for medical reasons. (*Id.*)

On March 21, 2021, Ms. Yando fell on her porch and tried to catch herself on her left hand. (Tr. 818.) The next day, she sought treatment at the emergency room. (*Id.*) Examination of the left wrist was limited due to pain but showed swelling, decreased range of motion, and intact pulses and sensation. (Tr. 819.) X-rays showed mild posterior soft tissue swelling and no acute osseous injury. (Tr. 819-20.) She was diagnosed with a left wrist sprain and discharged with instructions use naproxen and Flexeril as prescribed along with Tylenol. (Tr. 820.) And she was advised to follow up with Dr. Holt. (*Id.*)

Left shoulder and wrist x-rays were taken on March 30, 2021. (Tr. 710-13.) The shoulder x-ray showed no fracture, dislocation, or subluxation and only minor sternoclavicular joint hypertrophic changes as compared to a January 19, 2021 x-ray. (Tr. 710.) The wrist x-ray was compared to an x-ray from March 22, 2021. (Tr. 712.) There was no evidence of fracture, dislocation, or subluxation; the alignment was preserved, joint spaces were unremarkable, and there was no periosteal reaction or radiopaque foreign bodies identified. (*Id.*)

On April 5, 2021, Ms. Yando returned to Dr. Holt. (Tr. 686.) She reported pain in her shoulder and wrist. (*Id.*) She also reported pain in her neck that was causing headaches. (*Id.*)

She had intermittent numbness and tingling from her elbow to her fingertips. (*Id.*) She was using an Ace wrap for her wrist and said the swelling and bruising in her wrist had improved. (*Id.*) Dr. Holt again noted that Ms. Yando's reported tenderness was out of proportion to expectations, even with light touch over the clavicle, trapezius, shoulder, arm, fingers, and mid-forearm area. (Tr. 688.) Dr. Holt advised Ms. Yando to use a sling and wrist brace as needed. (Tr. 689.) He also advised her to rest, avoid aggravating activity, moderate her activity based on symptoms, slowly increase daily activities as able, continue with naproxen, attend physical therapy for her shoulder, and attend occupational therapy for her wrist. (*Id.*)

On April 12, 2021, Ms. Yando presented to Hocking Valley Occupational Therapy for her left wrist sprain. (Tr. 595-99.) Two sessions per week for six weeks were recommended. (Tr. 599.) Ms. Yando attended occupational therapy for her wrist in April and May. (Tr. 520-21, 581-91.) She complained of worsening carpal tunnel symptoms in both wrists/hands at a May 6, 2021 occupational therapy session (Tr. 520), and was discharged from occupational therapy at her request because she wanted to have a nerve test done for carpal tunnel syndrome (Tr. 521-22). Ms. Yando also attended physical therapy at Hocking Valley Physical Therapy for her left shoulder in April, May, and June 2021. (Tr. 453-56, 512-13, 574-76.) She attended thirteen sessions through June 17, 2021. (Tr. 453.)

Ms. Yando returned to Dr. Holt on May 5, 2021, reporting she was "doing better." (Tr. 691.) She was attending occupational and physical therapy; using naproxen, Flexeril, and heat; and working on strengthening and stretching. (*Id.*) She felt her motion and strength were better, and she denied numbness and tingling. (*Id.*) She described pain in the "anterior deltoid insertion and trapezius" and said that she had good days and bad days. (*Id.*) Dr. Holt again noted that Ms. Yando's tenderness was out of proportion to expectations to even light touch throughout the left

shoulder. (Tr. 693.) He also observed she was able to tolerate a blood pressure cuff without significant pain. (*Id.*) Dr. Holt recommended that Ms. Yando continue to use her upper extremity for day-to-day activities as tolerated, rest, and avoid aggravating activity. (Tr. 694.) He also recommended naproxen twice a day and advised her she could also take Tylenol. (*Id.*) He advised her to contact her primary care doctor if she wanted a refill of Flexeril, and said he would allow her to work with overhead activity restrictions and lifting limits. (*Id.*)

On May 17, 2021. Ms. Yando returned to Dr. Holt for evaluation of her hands. (Tr. 696.) She reported numbness in her hands since she was in her mid-twenties, and said she currently had intermittent numbness in the left hand more than the right that worsened with use of her hands. (*Id.*) She also reported pain in her hands that went into her forearms. (*Id.*) She was dropping objects, having symptoms at night, and having weakness. (*Id.*) She reported trying braces in the past. (*Id.*) Examination of the hands showed no swelling, bruising, atrophy, or deformity. (Tr. 698.) Sensation was intact to light touch. (*Id.*) Ms. Yando had good range of motion in her fingers, wrists, and elbow. (*Id.*) Tinel's was positive at the wrist going into the forearm, and Dr. Holt noted weakness on the left with finger abduction, adduction, flexion, extension, and pinch. (*Id.*) There was weakness on the right only with pinch. (*Id.*) Dr. Holt advised Ms. Yando to continue to use her wrist splints as needed, moderate activity based on her symptoms, rest, avoid aggravating activity, and treat symptomatically. (*Id.*) He also ordered an EMG and nerve conduction test of the cervical spine and upper extremities. (*Id.*)

EMG testing conducted on June 11, 2021, showed borderline to mild carpal tunnel syndrome bilaterally with no evidence of radiculopathy. (Tr. 714-15, *see also* Tr. 702.) Ms. Yando returned to Dr. Holt on June 16, 2021, for follow up regarding her wrists. (Tr. 700.) She reported intermittent numbness and tingling on the right with occasional weakness but good

motion. (*Id.*) She felt the splint was helping and said she had good motion and no current numbness or tingling, but she also reported intermittent swelling on the left. (*Id.*) Examination revealed: weakness in the fingers with flexion extension, abduction, and pinch; tenderness in the right from the CMC to MP region of the index, middle ring, and little finger rays; negative Tinel's on left but positive on right; and pain with Finklestein testing on the right and left. (Tr. 702-03.) Dr. Holt stated that the borderline to mild carpal tunnel syndrome EMG findings did not explain Ms. Yando's upper extremity symptoms or abnormal hand/wrist examination findings. (Tr. 703.) He recommended that she use a splint on her right wrist since there was improvement on the left with use of a splint. (*Id.*)

At her June 17, 2021 physical therapy session, Ms. Yando reported she was still having pain with overhead activities and that her shoulders were fatigued with exercise. (Tr 453.) She said her wrists prevented her from doing some of her shoulder exercises. (*Id.*) Examination showed tenderness to palpation in the wrists during shoulder strength testing, but the shoulders were not tender to palpation. (Tr. 453-54.) She was discharged from physical therapy at that session. (Tr. 453.) The reason for discharge was Ms. Yando's desire to focus on getting her wrist pain under control. (Tr. 453, 456.) She said she felt she could perform her shoulder exercises at home. (Tr. 453.) Discharge notes reflected: "Overall patient ha[d] made good improvement since beginning PT. She ha[d] achieved all goals set at IE . . . She [wa]s no longer in need of skilled PT at th[e] time, but she ha[d] a good understanding of the importance of continuing with her HEP in order to maintain the gains she ha[d] made." (Tr. 456.)

During an August 4, 2021 visit with Dr. Holt, Ms. Yando continued to report neck pain and pain in the forearms and wrists. (Tr. 705.) On examination, she demonstrated good strength and intact sensation to light touch in her upper extremities. (Tr. 707.) She had good motion in

her fingers, wrists, and elbows. (*Id.*) Finkelstein testing was negative on the left; there was pain on the right. (*Id.*) Dr. Holt recommended that Ms. Yando wear her splints as needed, rest, and avoid aggravating activity. (*Id.*) He advised that she could take over-the-counter medication as needed. (Tr. 707-08.) Dr. Holt felt that carpal tunnel surgery could help improve her carpal tunnel symptoms, but he did not believe it would treat all her symptoms. (Tr. 708.) Ms. Yando was not interested in moving forward with carpal tunnel surgery. (*Id.*)

On February 16, 2022, Ms. Yando returned to APRN Howe for a six-month follow-up appointment. (Tr. 747.) She reported daily shoulder pain that she thought was well managed with her current medications, but she said the pain made it difficult for her to keep her employment because her activity was limited. (Tr. 748.) Examination of the shoulder revealed tenderness to palpation with range of motion limited to 90 degrees. (*Id.*) APRN Howe refilled Ms. Yando's prescriptions for Flexeril and naproxen. (Tr. 747.)

On December 15, 2022, Ms. Yando sought emergency room treatment for left shoulder pain. (Tr. 803-04.) She reported sweeping the floor and folding laundry while sitting the day before and waking up with severe pain (10/10) in her left shoulder that radiated into the left side of her neck. (Tr. 804.) She reported increased pain with movement of her head, neck, and left arm. (*Id.*) Notes from the visit indicate that Ms. Yando was in no distress at the time and that she reported currently being treated for the injury and having already taken medication for it. (*Id.*) It was also noted that Ms. Yando reported that she was attempting to get disability for the injury and she had to have the "flare up on record because she is a 'work hazard' at this time." (*Id.*) Ms. Yando refused examination of her neck; she would not straighten her neck or allow cervical rotation. (Tr. 805.) Her examination revealed tenderness of the cervical back, noting:

> [Ms. Yando] [w]ill raise her left arm to almost 90 degrees. Cannot extend her arm across her body or bring behind her back. Will not allow exam of left neck,

> shoulder or trapezius. Pulls away to prevent examination. Is able to flex at the elbow and hold against mild resistance with the left arm. No edema or muscle wasting of the left upper extremity noted.

(Tr. 805.) Left shoulder x-rays showed mild degenerative changes at the AC joint. (Tr. 812-13.) There were no fractures or dislocations. (Tr. 805, 812-13.) Cathy Comerci, D.O., diagnosed acute exacerbation of chronic left shoulder pain and instructed Ms. Yando to use ice as needed for her neck and shoulder pain and to follow up with APRN Howe. (Tr. 805-06.)

Ms. Yando saw APRN Howe on February 7, 2023, complaining of right foot pain starting two months earlier. (Tr. 762.) She said her pain was intermittent and aggravated by walking and other activity; she described the pain as burning, achy, and sore. (*Id.*) APRN Howe advised Ms. Yando to use RICE therapy, take over-the-counter pain medication, avoid aggravating activities, and wear supportive footwear to treat plantar fasciitis of the right foot. (*Id.*)

On February 20, 2023, Ms. Yando saw Dr. Holt regarding her left shoulder pain. (Tr. 777.) It was noted that Ms. Yando had not been seen since May 2021.[1] (*Id.*) She reported a constant burning feeling in the anterolateral shoulder and trapezius. (*Id.*) She said the pain traveled from the shoulder area down to her hand. (*Id.*) She reported numbness in the left upper extremity and decreased range of motion in the shoulder. (*Id.*) She said her symptoms worsened with activity and reported trying to treat her symptoms with heat, rest, naproxen, and Flexeril. (*Id.*) Dr. Holt observed that Ms. Yando's examination revealed tenderness that was out of proportion to expectation with even light touch in the entire shoulder girdle area extending to the mid-forearm. (Tr. 779.) Shoulder x-rays taken that day showed no acute osseous or joint abnormality, a 3-millimeter focus of calcification adjacent to the left greater tuberosity, suspicious for tendinitis, and stable, mild degenerative changes at the acromioclavicular joint.

[1] Records indicate Ms. Yando actually saw Dr. Holt in June and August 2021 for wrist problems. (Tr. 700, 705.)

(Tr. 782-83.) Dr. Holt recommended that Ms. Yando stop taking naproxen and start meloxicam. (Tr. 780.) He recommended a diligent home exercise program and that she return to physical therapy since she previously had improvement of symptoms with physical therapy. (*Id.*)

On March 10, 2023, Ms. Yando presented for a physical therapy evaluation for her left shoulder. (Tr. 791-94.) The therapist recommended two sessions per week for six weeks (Tr. 794), but the record does not reflect either further visits or discharge.

In March and April 2023, Ms. Yando treated with Earl Driggs, DPM, for plantar fasciitis in both feet. (Tr. 903-08.) At her March 6, 2023 visit, Dr. Driggs recommended conservative care with stretching and ice, orthotics, and steroid injections. (Tr. 908.) At her visit on April 26, 2023, she reported improvement in her symptoms with use of orthotics, but continued to report mid arch pain in the right foot. (Tr. 903.) Dr. Driggs administered a cortisone injection into the right heel, noting she had done well with a prior injection.[2] (Tr. 903-04.)

**2. Relevant Opinion Evidence**

On August 27, 2024, APRN Howe authored a letter (Tr. 891) and completed a Medical Source Statement (Tr. 883-85.) In the letter, APRN Howe stated:

> My patient, Kristal Yando, has been under my care since June 10, 2020. Patient was initially seen for left shoulder pain in January of 2021. Since that time, patient has been seen on multiple occasions and has been referred to an Orthopedic Specialist and completed physical therapy and radiological imaging for management of health issue.
>
> Left shoulder pain and decreased range of motion and strength has continued since onset causing patient to have ongoing difficulties with activity. Please see additional documentation for limitations.

(Tr. 891.)

[2] The record does not reflect treatment for any impairment beyond April 2023.

The Medical Source Statement completed by APRN Howe was a check-box style form with the following available choices for rating the extent to which Ms. Yando could perform functional activities during an eight-hour workday: "none"; "rare," meaning no more than 10% of the day – less than one hour per day; "occasionally," meaning up to 1/3 of the time – up to 2½ to 3 hours per day; "frequently," meaning between 1/3 and 2/3 of the time – from 2½ or 3 hours to 5 ½ hours per day; and "continuously." (Tr. 883-85.) APRN Howe opined that Ms. Yando could: occasionally lift and/or carry one to ten pounds; rarely lift and/or carry eleven to twenty pounds; and never lift and/or carry twenty-one to fifty pounds (Tr. 883); frequently reach, handle, and finger with her right hand/arm; occasionally handle and finger with her left hand; rarely reach with her left hand/arm; and could not reach above shoulder level (Tr. 883-84); stand, walk, and sit for eight hours in an eight-hour workday (Tr. 884); occasionally crawl and climb steps and ladders (*id.*); and frequently bend, crouch, and squat (*id.*). He opined that, "[d]ependent on activity and left shoulder involvement," Ms. Yando's condition would likely deteriorate if placed under job-related stress. (*Id.*) He opined that it was not likely that Ms. Yando would be absent from work two or more days per month due to her conditions. (Tr. 885.) APRN Howe stated that the opined limitations had existed and persisted since March 31, 2023. (Tr. 885.) APRN Howe also checked a box that stated he reviewed medical records and treatment notes when completing the statement and that his assessment was based on diagnoses of AC joint degenerative joint disease and type two acromion. (*Id.*)

**C. Administrative Hearing**

At the September 9, 2024 hearing, Ms. Yando testified in response to questions from her attorney and the ALJ.[3] (Tr. 49-62, 68-69.) A Vocational Expert ("VE") also testified at the

[3] Ms. Yando first appeared for a hearing on October 20, 2023. (Tr. 76-80.) She requested and was granted a postponement of that hearing to obtain new representation. (Tr. 78.)

hearing. (Tr. 62-68.) The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination (Tr. 23, 63, 64), could not perform Ms. Yando's past work as a cashier but could perform representative positions in the national economy, including merchandise marker, routing clerk, and sales attendant, all light, SVP 2 positions (Tr. 64-65). The VE testified that no jobs would be available for the described individual if the individual could rarely (meaning not more that 10% of the day) lift or carry 11 to 20 pounds, occasionally lift or carry 1 to 10 pounds, occasionally use the left upper extremity for handling and fingering, and rarely (meaning no more that 10% of the day) reach in all directions with the left upper extremity. (Tr. 66-68.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)) (alteration in original). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B. Sole Assignment of Error: The ALJ Did Not Err in Evaluating APRN Howe's Opinion**

In her sole assignment of error, Ms. Yando argues the ALJ erred in evaluating APRN Howe's medical opinion, and specifically "failed to properly evaluate the mandatory factor of supportability." (ECF Doc. 7, pp. 7-11; ECF Doc. 9.) The Commissioner argues in response that the ALJ properly analyzed the supportability of the opinion.[4] (ECF Doc. 8, pp. 9-12.)

**1. Framework for Assessing Medical Opinion Evidence**

"The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician," *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). Accordingly, an ALJ is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Id.*

An ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a); *see Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024). But the ALJ must evaluate the "persuasiveness" of any medical opinions using "factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 404.1520c. Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important are supportability[5] and consistency.[6] 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2),

[4] The Commissioner also argues that the ALJ properly considered the consistency of APRN Howe's opinion, but that need not be considered herein as Plaintiff only challenges the ALJ's analysis of supportability.

[5] "Supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in his or her opinion. *See* 20 C.F.R. § 404.1520c(c)(1).

[6] "Consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record. *See* 20 C.F.R. § 404.1520c(c)(2).

404.1520c(c)(1)-(5). The ALJ must explain how he considered supportability and consistency, but need not explain how he considered the other factors. 20 C.F.R. § 404.1520c(b)(2).

**2. The ALJ Properly Evaluated APRN Howe's Opinion**

The ALJ analyzed APRN Howe's medical opinion as follows:

> The undersigned has read and considered the opinion of Mr. Howe, APRN, evidenced within Exhibit 9F from August 2024. The August 2024 notes the claimant's limits have dated back to March 2023, the period under consideration. The provider noted the claimant could lift/carry up to 10 pounds could frequently use the right hand and rarely use the left hand for reaching; could frequently use the right hand for handling/fingering and occasionally use the left hand for handling and fingering; could stand, walk and sit for 8 hours each; could not reach above shoulder level; would have postural limits; and the condition would deteriorate if placed under stress. <u>The undersigned has not adopted the exertional lifting/carry restrictions. The first notes that this is a check-the-box form with very little supporting rationale. Further, the undersigned finds the severity of his opined limitations are more restrictive than the objective evidence supports.</u> Diagnostically the imaging for the shoulder shows only mild findings and the carpal tunnel testing supports no more than borderline to mild findings. The claimant continued to engage in routine normal activities of daily living independently and experienced no more than slight reduction in strength at 4/5 in the left shoulder and experienced admitted improvement with conservative treatment including physical therapy, cock up splints for the wrists, and medications. The undersigned notes that manipulative limits would be supported, but the reaching limits in the right arm are not supported as there was no deficits in the right shoulder. The undersigned notes the bilateral handling/fingering limits are supported by the EMG findings and reports of numbness and tingling, but the testing findings supported equal borderline to mild findings consistent with no more than frequent handling/fingering bilaterally. The claimant admitted utilization of the cock-up splints and medications as well as therapy did help her symptoms. The undersigned has not adopted the postural limits verbatim, but finds some postural limits are supported given her bilateral plantar fasciitis requiring orthotics with some residual bilateral arch tenderness and from the reduced range of motion slight reduction in strength in the left arm and reports of numbness/tingling in the hands. <u>Thus, the undersigned finds Mr. Howe's statement and findings overall no more than partially persuasive as discussed herein finding the statement was more restrictive than the objective evidence supported during the period.</u>

(Tr. 33 (emphasis added).)

In support of her argument that the ALJ failed to properly evaluate supportability, Ms. Yando asserts: (1) the ALJ did not discuss a letter from APRN Howe that accompanied his

August 2024 medical source statement ("MSS"); (2) the letter "help[ed] to support [APRN Howe's] opined limitations"; (3) the failure to discuss the letter was "especially troubling" because the ALJ "discredited [APRN] Howe's opinions because they were supposedly nothing more than checked boxes"; and (4) APRN Howe's treatment records "also supported his opinions." (ECF Doc. 7, pp. 8-11.) In a nutshell, Ms. Yando argues that the ALJ erred in characterizing APRN Howe's opinion as "a check-the-box form with very little supporting rationale" (Tr. 33) without acknowledging the "detailed letter that gave specific supporting rationale" for the opinion. (ECF Doc. 7, p. 9; *see also* ECF Doc. 9, p. 3.)

The Commissioner argues in response that: (1) APRN Howe's MSS "did not reference the letter"; (2) "the letter itself does not support the significant limitations" in the MSS; and (3) APRN Howe's treatment records also do not support the limitations in the MSS. (ECF Doc. 8, pp. 11-12.) For the reasons stated below, the undersigned concludes that Ms. Yando has not met her burden to show that the ALJ erred in analyzing the supportability of APRN Howe's opinion.[7]

First, the undersigned finds no error in the ALJ's observation that the MSS "is a check-the-box form with very little supporting rationale." (Tr. 33.) The MSS is clearly a check-the-box form, and contains only limited written explanation. (*See* Tr. 883-85.) When checking a box saying Ms. Yando's condition was "likely to deteriorate if placed under stress, particularly stress associated with a job," APRN Howe wrote: "Dependent on activity and left shoulder involvement." (Tr. 884.) And he wrote that his assessment was premised on two diagnoses: "AC joint degenerative joint disease and type 2 acromion." (Tr. 885.) That is the full "supporting rationale" contained in the MSS. The ALJ thus accurately characterized the MSS and gave an appropriate reason for discounting the supportability of the opinion. *See Kreilach v. Comm'r of*

[7] The focus of Plaintiff's argument (ECF Doc. 7, pp. 10-11) and APRN Howe's August 27, 2024 letter (Tr. 891) is Plaintiff's left shoulder impairment. Accordingly, the Court's analysis also focuses on that impairment.

*Soc. Sec.*, 621 F. Supp. 3d 836, 847 (N.D. Ohio 2022) ("As a general matter, an ALJ may properly give little weight to a medical source's check-box form of functional limitations when it does not cite clinical test results, observations, or other objective findings.") (citing *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016) (collecting cases)).

Ms. Yando's argument that APRN Howe also wrote a "detailed letter that gave specific supporting rationale" for the opinion (ECF Doc. 7, p. 9) does not change this analysis. Ms. Yando asserts that the letter is important because it was provided "[a]long with" APRN Howe's MSS and "helps to support his opined limitations." (*Id.*) The Commissioner responds that APRN Howe "did not reference this letter or its explanation in his [MSS], nor is there any explanation, such as 'see letter,' suggesting these materials should be considered together." (ECF Doc. 8, p. 11.) Both are partially correct. Ms. Yando is correct that the letter was in the same exhibit as APRN Howe's MSS, albeit on the last page, following a release and appointment of representative form. (Tr. 881-91.) And the Commissioner is correct that the MSS does not reference the letter (Tr. 883-85); but the letter does appear to reference the MSS, stating: "Please see additional documentation for limitations" (Tr. 891). Ultimately, this Court need not decide whether the letter and MSS "should be considered together" in a supportability analysis because the letter provides little substantive rationale to support the limitations in the MSS and because the ALJ's decision reveals that he considered the substantive information outlined in the letter.

In the letter, APRN Howe stated:

> My patient, Kristal Yando, has been under my care since June 10, 2020. Patient was initially seen for left shoulder pain in January of 2021. Since that time, patient has been seen on multiple occasions and has been referred to an Orthopedic Specialist and completed physical therapy and radiological imaging for management of health issue.
>
> Left shoulder pain and decreased range of motion and strength has continued since onset causing patient to have ongoing difficulties with activity. Please see additional documentation for limitations.

(Tr. 891.) Thus, the letter describes the length of Ms. Yando's treating relationship with APRN Howe for left shoulder pain, his objective findings of "decreased range of motion and strength," her completion of physical therapy and referrals to orthopedics and for imaging, and her "ongoing difficulties with activity." (*Id.*) The fact that APRN Howe was treating Ms. Yando's left shoulder was already clear from the notes and diagnoses in the MSS. (*See* Tr. 884, 885.) And the fact that she reported pain and limitation, treated with physical therapy, and was referred for imaging and orthopedics all offer little substantive support for the degree of upper extremity limitation outlined in the MSS. Even the sole objective findings noted in the letter, "decreased range of motion and strength [that] has continued since onset," offer little support for an opinion that significantly limits reaching, handling, and fingering in both upper extremities.

Further, to the extent the information outlined in APRN Howe's letter is relevant to a supportability analysis, it is clear that the ALJ considered the information. For example, he explicitly considered Ms. Yando's complaints of left shoulder pain since January 2021, which reportedly increased with activity and caused functional limitations. (Tr. 24, 25.) He considered her left shoulder imaging, examination findings that included reduced strength and range of motion, and her treatment with physical therapy, injections, and medication, all with reported positive results. (Tr. 25-27.) The ALJ also acknowledged and discussed Ms. Yando's treatment with her orthopedic specialist, Dr. Holt. (Tr. 25-26.)[8] After outlining the treatment records and other evidence relating to Ms. Yando's left shoulder impairment, the ALJ explained:

> While the claimant reported recurrent left shoulder pain, it should be noted imaging was consistent with only some rotator cuff tendinitis and no more than mild degenerative changes. The treatment suggested during the relevant period remained no more than conservative with injection, medication management, and physical therapy intervention. The record supported no discussion of invasive treatment with any ablations or surgical interventions. The claimant reported needing to sling her arm 4 out of 7 days a week; however, during the relevant period left arm slinging

[8] When discussing Dr. Holt's treatment records, the ALJ incorrectly cites Exhibit 5F rather than Exhibit 2F.

> was not discussed with her medical providers in the records. The claimant continued to use her upper extremities to engage in relatively normal activities of daily living including independent personal care and driving. The claimant reported she continued to perform routine activities within her home, including cleaning, with some assistance from others. The claimant continued to pursue activities she enjoyed including adult coloring, with her dominant right upper extremity. The claimant was not seeking recurrent emergent treatment for shoulder symptom exacerbation during this period and there was no documented shoulder pain described as being intractable during this time.
>
> The undersigned appropriately considered the shoulder tendinitis and degeneration when reducing the claimant to the light exertional level with the above noted postural and exertional limits but specifically when providing limits to frequent reaching laterally and in front with the left upper extremity and occasional overhead reaching with the left upper extremity.

(Tr. 26-27.) The ALJ again addressed Ms. Yando's upper extremity limitations when discussing "additional documented inconsistencies and inconsistent statements," observing:

> The claimant reported she could not really lift any amount of weight with the left arm; however, this is inconsistent with the evidence showing only slight reduction in strength at 4/5 in the left arm with 5/5 being normal and with self-reported improvement in strength and motion after performing physical therapy. Further inability to lift with the left arm is inconsistent with the findings of her medical providers, noting she could use the arm with weight restriction. The claimant reported wrist and finger problems in the left and right arm, but noted the symptoms in the left arm were worse; however, objective . . . EMG testing supported no more than borderline to mild carpal tunnel in each hand. While she testified to wearing a sling 4 out of 7 days per week at the time of her hearing, utilization of a sling was not recommended or reported during the current period under adjudication.

(Tr. 31.) It is in the context of these observations that the ALJ addressed the supportability of APRN Howe's MSS findings. (Tr. 33.) Thus, Ms. Yando has failed to show that the ALJ's supportability analysis was lacking because he did not consider the objective findings and supporting explanations contained in APRN Howe's letter. *See* 20 C.F.R. § 404.1520c(c)(1).

Having found no error in the ALJ's observation that the MSS "is a check-the-box form with very little supporting rationale" (Tr. 33) or the ALJ's failure the explicitly reference APRN Howe's letter in doing so, the undersigned further observes that the ALJ's supportability analysis was not limited to the above observations regarding the MSS. The ALJ also found that "the

severity of [APRN Howe's] opined limitations are more restrictive than the objective evidence supports," citing to shoulder imaging showing "only mild findings," engagement in routine activities of daily living, "admitted improvement with conservative treatment including physical therapy . . . and medications," and the lack of "deficits in the right shoulder" to support reaching limitations on the right. (Tr. 33.) These observations are consistent with APRN Howe's limited treatment records, which the ALJ had cited in outlining Ms. Yando's complaints of left shoulder pain and conservative treatment with medication. (Tr. 25 (citing Tr. 732 (1/13/21 visit, treating left shoulder with medication), 735 (1/27/21 visit, treating left shoulder with medication), 739 (2/16/21 visit, left shoulder pain improved with medication but exacerbated by mopping and cleaning); Tr. 26 (citing Tr. 747 (2/16/22 visit, left shoulder pain well managed with medication); *see also* Tr. 736 (1/27/21 visit, left shoulder x-ray findings (no acute fractures/dislocations, some DJD) and medications assisting with left shoulder pain management).) Thus, the ALJ's supportability analysis also properly took into account the contents of APRN Howe's limited treatment records.

Ms. Yando's argument that "[t]he rest of the record concerning [APRN] Howe's treatment of Ms. Yando also supported his opinions" (ECF Doc. 7, p. 10) is immaterial. The ALJ considered the types of records and findings described in Ms. Yando's brief (*compare id.* at pp. 10-11 *with* Tr. 25-27), in addition to Ms. Yando's left shoulder complaints (Tr. 24), noted inconsistencies relating to those complaints (Tr. 31), and the opinions of the state agency medical consultants (Tr. 32), before concluding that the complete record did not support the significant upper extremity limitations outlined in APRN Howe's opinion (Tr. 33). Regardless of whether there is evidence to support APRN Howe's findings, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached

by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406. Here, Ms. Yando has failed to show that the ALJ's supportability findings lacked the support of substantial evidence.

For the reasons set forth above, the undersigned concludes that the ALJ's analysis of the supportability of APRN Howe's opinion, and consequent finding that the opinion was no more than partially persuasive, was both accurate and sufficient to allow for meaningful review by this Court. Further, the undersigned finds Ms. Yando has not met her burden to show that those findings lacked the support of substantial evidence.

Accordingly, the undersigned finds the sole assignment of error lacks merit.

## V. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

September 14, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).